**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| M-TEK KIOSK, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| RYAN CLAYTON and JOHN W. | ) | 1:15CV886 |
| GOSNELL, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Defendant John W. Gosnell's Motion to Dismiss Plaintiff's Second Amended Complaint ("Motion") [Doc. #26[1]]. Plaintiff M-Tek Kiosk, Inc. ("MTEK") initially filed this action against Defendants Ryan Clayton and John W. Gosnell in the United States District Court for the Western District of North Carolina. (Compl. Case No. 3:14-cv-609 [Doc. #1].) Gosnell moved to dismiss the Complaint, after which MTEK filed an Amended Complaint that Gosnell then moved to dismiss. [Docs. #11, 14, 16.] The Magistrate Judge recommended denying the motion and allowing MTEK to file a Second Amended Complaint because "[i]n short, the [Court] finds that there are inconsistencies, and perhaps errors, in the Amended Complaint that make proper evaluation of that pleading difficult." (Mem. R. & Order at 4 [Doc. #20] ("Recommendation").) The Court adopted the Recommendation [Doc. #22], after which MTEK filed a Second

---

[1] All references to Docket Entries on CM/ECF are to docket entries in this case, 1:15-cv-886, in the United States District Court for the Middle District of North Carolina.

Amended Complaint [Doc. #23] and a motion to change venue [Doc. #24]. In turn, Gosnell moved to dismiss the Second Amended Complaint. [Doc. #26]. While the Motion was pending, the Court granted MTEK's motion to change venue and transferred the case to the Middle District of North Carolina. [Doc. #33.]

In his Motion, Gosnell argues that the Second Amended Complaint ("Complaint") should be dismissed because, pursuant to Rules 8, 9, 10, 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, (1) the Complaint is an improper "shotgun" pleading, (2) the Court lacks subject matter jurisdiction over MTEK's claims against Gosnell, and (3) the Complaint fails to allege any claim against Gosnell upon which relief may be granted. [Doc. #26.] The Motion has been fully briefed and is ripe for review. For the reasons explained herein, the Motion is granted.

I.

According to the Complaint,[2] MTEK, an Oregon corporation with its principal place of business in Portland, Oregon, is owed at least $376,887.92 for unpaid invoices. (Compl. ¶¶ 1, 127.) In the summer of 2013, Luxury Tec, LLC ("Luxury Tec"), a North Carolina corporation with its principal place of business in Winston-Salem, North Carolina, began discussions with MTEK about the prospect of doing business together. (Id. ¶¶ 7, 11, 17.) Ryan Clayton, then Senior Vice President of

---

[2] Because Gosnell is challenging the Complaint pursuant to, among other rules, Rule 12(b)(6), all well-pled facts are assumed to be true and all reasonable inferences are drawn in favor of MTEK. Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 253 (4th Cir. 2009).

International Business for Luxury Tec, approached David Thibeau, MTEK's President, in May of 2013 about ordering specialized electronic equipment from MTEK. (Id. ¶¶ 15, 17.) In July 2013, Clayton visited Thibeau and other MTEK representatives in Oregon, toured the MTEK facilities, and discussed various projects. (Id. ¶ 18.) That same month, Thibeau traveled to Winston-Salem, North Carolina to meet with Clayton and Brian Reid, the founder, manager, and president of Luxury Tec[3] at Luxury Tec's office. (Id. ¶¶ 8, 14, 19.) Clayton and Reid took Thibeau on a tour of the office and showed him Gosnell's desk and workspace. (Id. ¶ 19.) After MTEK delivered equipment prototypes to Luxury Tec in September 2013, Clayton traveled to Oregon multiple times to discuss additional business with MTEK. (Id. ¶¶ 21, 22.)

"During this time period,"[4] Clayton and Reid represented to Thibeau that Luxury Tec was adequately capitalized, that Gosnell was a significant investor and played an active role in Luxury Tec's strategy and business planning, that Luxury Tec had other investors providing operational funding, that Luxury Tec had secured a $3 million line of credit, and that Luxury Tec had adequate funding for its projects with MTEK. (Id. ¶¶ 23-27.) MTEK alleges that Clayton and Reid knew their representations were false and intended to induce MTEK to enter into

---

[3] Unlike Clayton and Reid, Gosnell is not alleged to have had any ownership interest in or to have been an officer of Luxury Tec. (See id. ¶¶ 8, 10, 14, 15.)

[4] It is unclear from the Complaint to what precise time period this phrase refers. However, the context of the allegation suggests that it refers to the time period during which MTEK and Luxury Tec were beginning their business relationship or, perhaps, after MTEK delivered prototypes in September 2013 or, perhaps, both.

3

business with Luxury Tec. (Id. ¶¶ 28, 29; see also id. ¶ 34.)  MTEK also alleges that Gosnell knew that Clayton and Reid were falsely representing information material to Luxury Tec's financial status because Clayton and Reid called Gosnell repeatedly in Thibeau's presence as early as September 2013 to discuss related issues and because Gosnell was copied on relevant emails. (Id. ¶ 30.)  Despite purported opportunities to do so, Gosnell failed to notify MTEK of these false representations. (Id.)

On November 7, 2013, Gosnell paid for debt or bankruptcy counseling on behalf of Luxury Tec Holdings, LLC and Luxury Tec. (Id. ¶¶ 31, 32.)  The following week, on November 14, 2013, Luxury Tec Holdings, LLC and Luxury Tec filed for Chapter 7 bankruptcy in the Middle District of North Carolina. (Id. ¶ 33.)  Because MTEK was not a creditor of Luxury Tec, it did not receive notice of the bankruptcy and had no reason otherwise to know of the bankruptcy "in light of misrepresentations and omissions by" Clayton, Reid, and Gosnell. (Id. ¶ 36.)

The day before Luxury Tec filed for bankruptcy, The Mirrenium Group, LLC ("Mirrenium") was formed in Delaware with its principal place of business in Winston-Salem, North Carolina and its sole members as Clayton, Reid, and Gosnell. (Id. ¶¶ 37-39.)  Clayton and Reid each owned 29.80515%, and Gosnell owned 22.80094% of Mirrenium. (Id. ¶¶ 82-84.)  The Complaint refers to Clayton, Reid, and Gosnell as "the sole members of Mirrenium[,]" but does not account for the remaining 17.58856% ownership in Mirrenium. Reid was the Chief Marketing and Business Development Officer, and Clayton was the Chief Technology Architect

4

and Managing Director of Global Markets. (Id. ¶¶ 42, 43.) Gosnell is not alleged to have been an officer or director, but, instead, is alleged to have been a member with control over Mirrenium including decision-making authority over strategy, business planning and development, accounting, and contracts. (Id. ¶¶ 44, 150.)

MTEK alleges that Clayton, Reid, and Gosnell intentionally concealed Luxury Tec's bankruptcy filing by telling MTEK that the name change to Mirrenium was simply rebranding. (Id. ¶¶ 40, 41.) (But see id. ¶ 41 (alleging that only Clayton misrepresented to MTEK that Luxury Tec had changed its name as a strategic branding decision but that Reid and Gosnell had participated in that branding decision).)

According to the Complaint, Clayton, Reid, and Gosnell formed Mirrenium to conceal Luxury Tec's insolvency and to fraudulently induce MTEK to continue to do business. (Id. ¶¶ 45, 54, 87 (alleging that Clayton, Reid, and Gosnell fraudulently induced MTEK to enter into and fulfill the agreements described below), 96.) Clayton, Reid, and Gosnell allegedly knew Mirrenium was undercapitalized when it was formed because it was functionally the same company as Luxury Tec. (Id. ¶¶ 49, 86.) In other words, Mirrenium was formed to create a fake partition from Luxury Tec. (Id. ¶¶ 46, 46.a.-f.; see also id. ¶ 54, 54.a.-d.) Because Gosnell coordinated and financed Luxury Tec's debt and bankruptcy counseling, he allegedly knew that Mirrenium was the same company as Luxury Tec and in grave financial difficulty; yet, he intentionally caused and allowed MTEK to believe that Mirrenium was solvent. (Id. ¶¶ 46.e., 54.e.) MTEK

5

alleges as evidence of Gosnell's "intimate[] involve[ment] with Mirrenium's discussions with MTEK" Clayton's and Reid's telephone calls to Gosnell in Thibeau's presence, as early as September 2013,[5] during which Reid, Clayton, and Gosnell discussed aspects of the business between Mirrenium and MTEK. (Id. ¶ 54.f.)

From approximately December 2013 through January 2014, MTEK and Mirrenium entered into three agreements ("Agreements") for Mirrenium's purchase of countertop display units totaling more than $376,887.92. (Id. ¶¶ 55-80, 127.) Of the money owed to MTEK, Mirrenium has paid approximately $54,000 for the prototypes and associated services provided to Luxury Tec in September 2013 and $30,000 for money owed under the various agreements. (Id. ¶¶ 53, 95.)

In December 2013 and January 2014, Clayton promised to pay MTEK for the products and services purchased under the agreements. (Id. ¶¶ 98-101.) Then, in May 2014, Thibeau spoke on the telephone with Gosnell who represented that Mirrenium was adequately capitalized and that it would pay MTEK "soon[.]" (Id. ¶ 188.) Despite the fact that Mirrenium owed money to MTEK under the

---

[5] Although MTEK alleges that Clayton and Reid called Gosnell in Thibeau's presence as early as September 2013, MTEK alleges that Thibeau met with Clayton and Reid in Winston-Salem, North Carolina in July 2013. MTEK also alleges that only Clayton, and not also Reid, visited Thibeau in Oregon in July 2013 and possibly alleges that he did so in September and October 2013. (See id. ¶¶ 18, 19, 22.) Not only is the timing of these telephone calls to Gosnell unclear, but the entity with whom MTEK would have been doing business is also unclear. The only specific timing alleged would have involved Luxury Tec, but MTEK asserts the allegations as part of its argument against Mirrenium.

Agreements, between December 2013 and April 2014, Mirrenium made payments to Reid of at least $87,683 and to Clayton of at least $72,486.65. (Id. ¶¶ 91, 131.)  Mirrenium is not alleged to have made payments to Gosnell, although Gosnell is alleged to have approved with full knowledge the payments to Reid and Clayton. (Id. ¶ 92.)  In July 21, 2014, Mirrenium filed for bankruptcy in the United States Bankruptcy Court for the District of Delaware. (Id. ¶ 81.)

MTEK has asserted nine claims against Clayton and Gosnell:[6] (1) pierce the corporate veil, (2) fraud, (3) breach of fiduciary duty, (4) constructive fraud, (5) fraudulent transfers, (6) unfair and deceptive trade practices, (7) civil conspiracy, (8) negligent misrepresentation, and (9) punitive damages. (Id. ¶¶ 125-97.)

II.

Gosnell first argues that the Complaint is a "shotgun" pleading and should be dismissed.  While MTEK asserts its fraudulent transfer claim against "Defendants" (Compl. ¶¶ 161-72) and otherwise periodically refers to "Defendants" (id. ¶¶ 89, 93-98, 102), it is sufficiently clear from the Complaint what MTEK alleges Gosnell did with or independently of Clayton and Reid such that Gosnell is on notice of the allegations against him and can defend himself accordingly.  There are instances where MTEK has replaced references to "Defendants" in its First Amended Complaint with "Gosnell, Clayton, and Reid" in this Complaint, but, in context, those references appear to be purposeful

---

[6] Reid allegedly filed for personal bankruptcy in the fall of 2014. (Id. ¶ 85.)

allegations of conduct by all three individuals.  As Gosnell notes, there are also

instances where allegations contradict themselves, but those are not so plentiful as

to support dismissing the Complaint as a shotgun pleading.  Therefore, after a

thorough review of the allegations in the Complaint and a comparison to the

allegations in the First Amended Complaint that concerned the Magistrate Judge,

the Complaint will not be dismissed on this ground.

III.

Gosnell argues that this Court lacks subject matter jurisdiction over four of

the claims asserted against him in this action because MTEK does not have

standing to assert its veil piercing, fraudulent transfer, breach of fiduciary duty,

and constructive fraud claims. (Br. in Supp. of Def. John W. Gosnell's Mot. to

Dismiss ("Brief in Support") at 9-10 [Doc. #27].)  Gosnell contends that those

claims belong to Mirrenium's bankruptcy trustee as property of the bankruptcy

estate and there has been no judicial determination that the trustee has abandoned

those claims.[7]  (Id.)  Because Gosnell "attack[s] the existence of subject matter

jurisdiction over the case apart from the pleadings," the Court can weigh evidence

to determine the existence of jurisdiction. Pro-Football, Inc. v. Blackhorse, 62 F.

Supp. 3d 498, 502 (E.D. Va. 2014) (citing Williams v. United States, 50 F.3d 299,

---

[7]  The Court has taken judicial notice that Mirrenium's bankruptcy case closed on
January 20, 2015. (Case No. 14-11762-BLS (Bankr. D. Del.) Doc. Entry Jan. 20,
2015.)  Months after the bankruptcy case closed, the parties briefed Gosnell's
argument that various claims belonged to the bankruptcy estate, but neither party
has provided any further information to the Court about the bankruptcy case.

304 (4th Cir. 1995); Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982)); see also id. (noting that the other way a defendant may challenge subject matter jurisdiction is by attacking the facts as alleged in the complaint which would be assumed to be true for purposes of evaluating the jurisdictional challenge and citing Adams, 697 F.2d at 1219).

In support of his argument that these various claims belong to the bankruptcy trustee and not to MTEK, Gosnell cites Fourth Circuit cases and district court and bankruptcy cases within the Fourth Circuit, apparently assuming that there is no choice of law issue on the matter. (Compare Bf. in Supp. at 7-10 with id. at 11-17.) Likewise, in its response to Gosnell's Motion, MTEK seemingly assumes there is no choice of law issue on the matter and relies almost entirely on North Carolina state law. (Opp'n to Def. Gosnell's Mot. to Dismiss ("Brief in Opposition") at 7-10 [Doc. #31].)

Nevertheless, it is determined that North Carolina's choice of law rules do apply to an analysis of Gosnell's argument that various claims belong to the bankruptcy estate. Section 541 of the Bankruptcy Code provides that the estate includes, among other things, "all legal and equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "Federal bankruptcy law looks to state law for [the] definition of what interests are rights of the debtor or creditors of the debtor." Steyr-Daimler-Puch of Am. Corp. v. Pappas, 852 F.2d 132, 135 (4th Cir. 1988) (explaining that "[t]he courts that have confronted the issue whether an alter ego claim can be brought by the trustee

9

have accordingly looked to the nature of that claim under state law"); see also In re Nelson, 521 B.R. 733, 736 (D.S.C. 2014) ("Although federal law defines what property interests are included within the bankruptcy estate, state law determines the nature and existence of a debtor's property interests.") (citation omitted).

In a diversity action such as this, the court must apply the choice of law rules of the state in which it sits. Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487, 496, 61 S. Ct. 1020, 1021 (1941) superseded by statute on other grounds. In the Fourth Circuit, the Klaxon rule also applies to a federal bankruptcy court "in the absence of a compelling federal interest which dictates otherwise, . . . where [the court] seeks to determine the extent of a debtor's property interest." In re Merritt Dredging Co., Inc., 839 F.2d 203, 205-06 (4th Cir. 1988). While bankruptcy cases involve federal law, bankruptcy courts may "face situations in which the applicable federal law incorporates matters which are the subject of state law." Id. at 205. "The argument for applying the Klaxon rule to state law questions arising in bankruptcy cases is compelling." Id. at 206. "A uniform rule under which federal bankruptcy courts apply their forum states' choice of law principles will enhance predictability in an area where predictability is critical." Id.; see also id. ("It would be anomalous to have the same property interest governed by the laws of one state in federal diversity proceedings and by the laws of another state where a federal court is sitting in bankruptcy.").

The Court has not located any North Carolina Supreme Court case explaining North Carolina's choice of law rules with respect to determining if a claim belongs

to a creditor or to the debtor in bankruptcy.[8] See Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc., 296 F.3d 308, 312 (4th Cir. 2002) (explaining that a federal court sitting in diversity has an obligation to apply the law as provided by the state's highest court). "Where the law is unclear, the federal court must predict how the highest state court would rule, considering canons of construction, restatements of the law, treatises, recent pronouncements of general rules of policies, well-considered dicta, and the state's trial court decisions." In re Bostic Constr., Inc., 435 B.R. 46, 61 (Bankr. M.D.N.C. 2010) (citing Private Mortg. Inv. Servs., Inc., 296 F.3d at 312 and Liberty Mut. Ins. Co. v. Triangle Indus., Inc., 957 F.2d 1153, 1156 (4th Cir. 1992)).

Just as the Fourth Circuit in In re Merritt Dredging Co., Inc. noted the importance of predictability in the bankruptcy context, the North Carolina Supreme Court has acknowledged the importance of "certainty, uniformity, and predictability of outcome in choice of law decisions." Boudreau v. Baughman, 322 N.C. 331, 336 (1988) (explaining that North Carolina's traditional conflict of laws rule applicable to parties' substantial rights is lex loci, the law of the situs of the claim). Likewise, among the factors provided in Restatement (Second) of Conflict of Laws "relevant to the choice of the applicable rule of law" are "certainty,

---

[8] To be certain, there are federal district and bankruptcy court cases that analyze, under North Carolina law, whether or not particular claims belong to a creditor or to the debtor's estate in bankruptcy. See, e.g., In re Bostic Constr., Inc., 435 B.R. 46 (Bankr. M.D.N.C. 2010). However, those cases do not discuss the choice of law issue.

predictability, and uniformity of result[.]" Restatement (Second) of Conflict of Laws § 6 (1971) ("Restatement"). In this case, it is determined that the North Carolina Supreme Court would find that the most effective way to ensure certainty, predictability, and uniformity of the outcome of choice of law decisions in situations such as this is to decide the issue as the federal bankruptcy court in which Mirrenium filed its Chapter 7 voluntary petition would decide the issue. In other words, this Court will apply the same law as the United States Bankruptcy Court for the District of Delaware would have applied had it determined whether MTEK's claims for piercing the corporate veil, constructive fraud, fraudulent transfer, and breach of fiduciary duty belonged to MTEK or the bankruptcy estate.

In the Third Circuit, just as in the Fourth Circuit, "it is well settled . . . that a bankruptcy court faced with the issue of which substantive state law to apply to a claim for relief . . . applies the choice of law rules of the forum state." In re SemCrude, L.P., 407 B.R. 82, 104 (Bankr. D. Del. 2009) (citing, among other cases, In re PHP Healthcare Corp., 128 F. App'x 839, 843 (3d Cir. 2005)). "In resolving choice of law questions, Delaware [state] courts apply the Restatement (Second) of the Law of Conflict of Laws." Id. at 105 (citing Travelers Indem. Co. v. Lake, 594 A.2d 38, 46-47 (Del. 1991) and Oliver B. Cannon & Son, Inc. v. Dorr-Oliver, Inc., 394 A.2d 1160, 1166 (Del. 1978)); see also Enzo Life Scis., Inc. v. Adipogen Corp., 82 F. Supp. 3d 568, 595 (D. Del. 2015); Sinnott v. Thompson, 32 A.3d 351 (Del. 2011) (explaining that Delaware courts use the "most

significant relationship test" in the Restatement (Second) of Conflict of Laws to analyze choice of law issues).

A.

First, Gosnell challenges MTEK's standing to bring its claim to pierce Mirrenium's corporate veil. In the Complaint, MTEK alleges that Mirrenium was the alter ego of Clayton, Reid, and Gosnell. (Compl. ¶ 51.) In support of this allegation, MTEK alleges that Gosnell controlled Mirrenium's decision-making, strategy, business planning, finances, and operations; Thibeau witnessed Clayton and Reid make multiple telephone calls to Gosnell as early as September 2013 to discuss ordering from MTEK, capitalization, and related issues; Clayton and Gosnell committed fraud by inducing MTEK to continue to do business with Mirrenium even though they knew Mirrenium was insolvent or close to insolvent; and Mirrenium was grossly undercapitalized. (Id. ¶ 51.a.-d.) MTEK also alleges that Mirrenium failed to observe corporate formalities, that its assets were commingled with the assets of Clayton and Gosnell, and that Clayton and Gosnell siphoned Mirrenium's funds. (Id. ¶ 51e.-g.; see also id. ¶¶ 131-32.) Elsewhere in the Complaint, MTEK alleges that Clayton and Gosnell dominated and controlled Mirrenium so that it manifested no separate corporate interest. (Id. ¶ 93; see also id. ¶¶ 128-30, 132.) Based on Clayton's and Gosnell's alleged misrepresentations, MTEK entered into and fulfilled its obligations under the Agreements and sustained at least $376,887.92 in damages as a direct and proximate result of Mirrenium's failure to honor its contractual obligations. (Id. ¶¶ 126-27, 134, 138.)

13

Because the underlying issue is whether the Trustee could have brought a claim to pierce Mirrenium's corporate veil – or, stated differently, whether the debtor corporation could assert a claim to pierce its own corporate veil – the internal affairs doctrine applies. As the Delaware Supreme Court has acknowledged, "[t]he internal affairs doctrine is a long-standing choice of law principle which recognizes that only one state should have the authority to regulate a corporation's internal affairs – the state of incorporation." VantagePoint Venture Partners 1996 v. Examen, Inc., 871 A.2d 1108, 1112 (Del. 2005). The doctrine "applies to those matters that pertain to the relations among or between the corporation and its officers, directors, and shareholders." Id. at 1113. Although the internal affairs doctrine does not apply in circumstances such as contracts and torts where the rights of third parties external to the corporation are at issue, id. at 1113 n.14, "the conflicts practice of both state and federal courts has consistently been to apply the law of the state of incorporation to 'the entire gamut of internal corporate affairs[,]'" id. at 1113.

Applying the law of the state of incorporation or, for an LLC, the state of formation, Xcell Energy & Coal Co. LLC v. Energy Inv. Grp. LLC, No. 8652-VCN, 2014 WL 2964076, *5 (Del. Ch. June 30, 2014) (unpublished), "'will usually be supported by those choice-of-law factors favoring the need of the interstate and international systems, certainty, predictability and uniformity of result, protection of the justified expectations of the parties[,] and ease in the application of the law to be applied.'" VantagePoint Venture Partners 1996, 871 A.2d at 1113 (quoting

Restatement (Second) of Conflict of Laws § 30[2]); see also id. at 1112 (explaining that the doctrine "developed on the premise that, in order to prevent corporations from being subjected to inconsistent legal standards, the authority to regulate a corporation's internal affairs should not rest with multiple jurisdictions").  In other words, the doctrine's "certainty and predictability . . . protects the justified expectations of the parties with interests in the corporation." Id. at 1113.

Therefore, because Mirrenium was formed in Delaware, Delaware law applies to determine if the claim belongs to the trustee or MTEK. Cf. In re Alper Holdings USA, Inc., 396 B.R. 736, 759 (S.D.N.Y. 2008) (noting that the court in In re OODC, LLC, 321 B.R. 128 (Bankr. D. Del. 2005), "necessarily" applied Delaware law to the question of whether the trustee could bring a claim to pierce the corporate veil where the debtor was a Delaware corporation).

Although research has not revealed any Delaware state court that has determined whether a corporation may pierce its own veil, "[f]ederal courts have held that Delaware law allows a debtor corporation to pierce its own corporate veil, thereby giving a bankruptcy trustee . . . exclusive standing to assert an alter ego[9] claim on behalf of the bankruptcy estate." Raytheon Co. v. Boccard USA Corp., 369 S.W.3d 626, 633 (Tex. App. 2012) (citing, among other cases, In re Alper Holdings USA, Inc., 396 B.R. 736, In re OODC, LLC, 321 B.R. 128, and In re

---

[9] Delaware law uses the phrases "piercing the corporate veil" and "alter ego" interchangeably. Winner Acceptance Corp. v. Return on Capital Corp., No. 3088-VCP, 2008 WL 5352063, at *5 n.32 (Dec. Ch. Dec. 23, 2008).

15

Enron Corp., No. 02-3609, 2003 WL 1889040 (Bankr. S.D.N.Y. Apr. 17, 2003) (unpublished)); see also In re Kilroy, 357 B.R. 411, 430 (S.D. Tex. 2006) (finding "that Delaware courts could apply veil piercing to LLCs under certain circumstances"); MC Asset Recovery, LLC v. S. Co., No. 1:06-CV-0417-BBM, 2006 WL 5112612, at *10 (N.D. Ga. Dec. 11, 2006) (acknowledging that "there are no Delaware cases directly on-point," but agreeing with cases that "have interpreted Delaware law to permit . . . a corporation to pierce its own veil"); Westmeyer v. Flynn, 889 N.E.2d 671, 678 (Ill. App. Ct. 2008) (concluding that "under Delaware law, . . . the corporate veil of an LLC may be pierced, where appropriate").

Therefore, at least according to the court in In re Alper Holdings USA, Inc., "under Delaware law, a trustee possesses standing to bring . . . an alter ego claim on behalf of a creditor of the debtor, as long as the claim qualifies as a 'general' claim." 398 B.R. at 759. A claim is general in nature if "no particularized injury aris[es] from it;" whereas, a claim is personal to the creditor "if other creditors generally have no interest in that claim." In re Emoral, Inc., 740 F.3d 875, 876 (3d Cir. 2014); see also In re Enron Corp., 2003 WL 1889040, at *5 (finding the alter ego claim to be general in nature where the conduct of debtors that allegedly looted and controlled other debtors and thereby injured the plaintiff was the same conduct that allegedly injured all other creditors of the various debtors to whom obligations were not met).

16

Here, MTEK's claim to pierce Mirrenium's corporate veil is general in nature in that Clayton's and Gosnell's alleged conduct as the alter ego of Mirrenium is not only the same conduct that could underlie any other of Mirrenium's creditors' claims, but would cause the same injury to those creditors – money owed. As a whole, MTEK alleges that Clayton and Gosnell exercised complete domination over Mirrenium, induced MTEK into entering contracts with the grossly undercapitalized Mirrenium, and directed money from Mirrenium to Clayton and Reid. "As a direct and proximate result of Gosnell's and Clayton's complete domination and control over Mirrenium[,]" MTEK was injured. Likewise, so, too, could other creditors claim injury from the same conduct. MTEK's claim to pierce Mirrenium's corporate veil is not based on conduct and injury particular or personal to MTEK. Therefore, under Delaware law, only the bankruptcy trustee has standing to assert such a claim.

B.

Gosnell also argues that MTEK does not have standing to bring a fraudulent transfer claim. MTEK alleges that "between December 2013 and April 2014, while Mirrenium was indebted to MTEK under the Agreements, Mirrenium made payments to Reid of at least, without limitation, $87,683.00 and made payments to Clayton of at least, without limitation, $72,486.65." (Compl. ¶ 91.) These payments were allegedly "made with the full knowledge and approval of Clayton and Gosnell" for "their own benefit or for the benefit of other members or enterprises owned by or affiliated with them" while "Mirrenium failed to remit

17

payment to MTEK." (Id. ¶ 92.)  In its allegations specific to the claim for fraudulent

transfers, MTEK alleges that the transfers were made "without Mirrenium receiving

a reasonably equivalent value in exchange for the Transfers" so that Mirrenium's

"assets . . . were unreasonably small in relation to its business." (Id. ¶¶ 165-66.)

"Mirrenium knew and/or should have known that it would incur debts beyond its

ability to pay when they became due." (Id. ¶ 166.)

As a Delaware court has recognized, there is "uncertainty as to how best to

classify a fraudulent transfer claim" for choice of law purposes because

"[f]raudulent transfers bear some resemblance to both tort and contract claims and

do not fit neatly into either category." TrustCo Bank v. Mathews, No. 8374-VCP,

2015 WL 295373, at *9 (Del. Ch. Jan. 22, 2015) (unpublished) (analyzing

whether Delaware or Florida law should apply and addressing both the torts and

contract factors in the Restatement (Second) of Conflict of Laws to determine

which state's laws to apply).

First, applying the choice of law factors for torts from the Restatement, as

did the Trust Co Bank court, North Carolina law would likely apply.  These factors

include the place (1) where the injury occurred, (2) where the conduct causing the

injury occurred, (3) where the parties reside or are incorporated and have their

places of business, and (4) where the relationship between the parties is centered.

Restatement (Second) of Conflicts of Laws § 145(2).  Courts evaluate these

factors "according to their relative importance with respect to the particular issue."

Id.

18

Furthermore, "[t]he purpose sought to be achieved by the relevant tort rules of the interested states, and the relation of these states to the occurrence and the parties, are important factors to be considered." Restatement (Second) of Conflicts of Laws § 145 cmt. c. For example, "[i]f the primary purpose of the tort rule involved is to deter or punish misconduct, . . . the state where the conduct took place may be the state of dominant interest and thus that of the most significant relationship." Id. "On the other hand, when the tort rule is designed primarily to compensate the victim for his injuries, the state where the injury occurred . . . may have the greater interest in the matter." Id. The Restatement not only acknowledges that "every tort rule is designed both to deter other wrongdoers and to compensate the injured person[,]" but also that "it will frequently be difficult to tell which of these objectives is the more important." Id.

Under Delaware law, a corporation sustains its injuries in the state in which it is incorporated and in which it has its principal place of business, the latter generally being more important. TrustCo Bank, 2015 WL 295373, at *10. MTEK is incorporated in and maintains its principal place of business in Oregon; therefore, it sustained its injuries there. The conduct causing the injury took place in North Carolina, where Mirrenium maintained its principal place of business and Clayton and Reid – to whom Mirrenium transferred funds – resided. For these same reasons, although MTEK is incorporated in and maintains its principal place of business in Oregon, the third factor favors applying North Carolina law. Mirrenium maintained its principal place of business in North Carolina where Clayton and Reid

19

resided.  Finally, the allegations in the Complaint describe a business relationship in Oregon and North Carolina.

Because MTEK's allegations of fraudulent transfers would have not only affected MTEK's ability to recover under the Agreements, but would also have affected the ability of Mirrenium's other creditors to recover debts owed to them, MTEK's state of incorporation and principal place of business does not weigh as heavily as the state where the conduct causing the injury took place – North Carolina.  Therefore, based on the factors in the Restatement for tort actions, North Carolina law would apply.

Next, the Restatement factors for determining the applicable law to contract issues include the places of contracting, negotiating, and performing; the location of the subject matter of the contract; and the residence, place of incorporation, and place of business of the parties. Restatement (Second) of Conflicts of Law § 188(2).  As with the torts factors, these factors are evaluated "according to their relative importance with respect to the particular issue." Id.  It is difficult, if not impossible, to tell from the allegations in the Complaint the place of contracting, as MTEK merely alleges that "Mirrenium and MTEK entered into an agreement[.]" (Compl. ¶¶ 58, 67, 73.)  Either Oregon or North Carolina would likely have been the place of contracting.  While the early business negotiations took place both in Oregon (id. ¶¶ 18, 22) and North Carolina (id. ¶ 19), allegations of the place of negotiations surrounding the specific Agreements are less specific (id. ¶¶ 57, 63, 71.)  However, with at least one of the Agreements, Clayton is alleged to have

"informed" MTEK of the need for products. (Id. ¶ 55.)  Therefore, again, either Oregon or North Carolina would likely have been the place of negotiation.

Likewise, the performance of the contract and the location of the subject matter of the contract both have contacts with several states.  MTEK would have produced the units at issue in Oregon and delivered them to Mirrenium in North Carolina (id. ¶ 59), to a Paul Mitchell store in Illinois (id. ¶ 63), and to stores in New York (id. ¶ 78).  Mirrenium would then have paid MTEK for the units presumably from Mirrenium's North Carolina offices.  Finally, as noted before, MTEK's incorporation and principal place of business is in Oregon, while Mirrenium's principal place of business is in North Carolina.  These factors tip slightly in favor of Oregon because MTEK is incorporated there, has its principal place of business there, produced the units at issue there, and is owed money there.

Nevertheless, because the nature of the fraudulent claim in this case focuses on payments Mirrenium made to Clayton and Reid, which Gosnell approved, for the benefit of Clayton and Reid, it is determined that North Carolina is the state with the most significant relationship to this claim.

In North Carolina, "any transfer that fraudulently or unlawfully deprives all creditors of their right to an insolvent corporation's assets necessarily gives rise to a cause of action shared by those creditors and not unique to any one of them." Angell v. Kelly, 336 F. Supp. 2d 540, 545, 546 (M.D.N.C. 2004) (comparing Underwood v. Stafford, 155 S.E.2d 211 (N.C. 1967) (finding claim belonged to receiver) with Synder v. Freeman, 266 S.E.2d 593 (N.C. 1980) (finding claim

belonged to creditor)).  Here, MTEK's allegations of fraudulent transfers could have been brought by any of Mirrenium's creditors.  Therefore, under North Carolina law, MTEK lacks standing to bring this claim.  See id. at 546.

C.

Gosnell also challenges MTEK's standing to bring a claim for breach of fiduciary duty.  In its Complaint, MTEK alleges that Mirrenium was "insolvent continuously from the time it was formed through the time it went into bankruptcy." (Compl. ¶ 150.)  Allegedly, Gosnell and Clayton breached their fiduciary duties to MTEK "by, among other thing[s], misrepresenting material facts to MTEK, concealing material facts from MTEK, and transferring Mirrenium's assets to its members instead of using those assets to pay MTEK the money owed under the Agreements." (Id. ¶ 152.)

Just as Delaware courts apply the internal affairs doctrine to choice of law issues surrounding a claim to pierce the corporate veil, so, too, do they apply the internal affairs doctrine to a breach of fiduciary duty claim. In re PMTS Liquidating Corp., 452 B.R. 498, 507 (Bankr. D. Del. 2011).  Therefore, as above, because Mirrenium was formed in Delaware, Delaware law applies to determine if this claim belongs to the bankruptcy estate or MTEK.

Under Delaware law, "individual creditors of an insolvent corporation have no right to assert direct claims for breach of fiduciary duty against corporate directors," but may pursue derivative actions on behalf of the insolvent corporation. N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla, 930

22

A.2d 92, 103 (Del. 2007). However, creditors of an LLC have no standing to bring even a derivative suit. CML V, LLC v. Bax, 28 A.3d 1037, 1041, 1046 (Del. 2011) (explaining that "[t]he plain language of [Del. Code tit. 6,] § 18-1002 is unambiguous and limits derivative standing in LLCs exclusively to 'member[s]' or 'assignee[s]'"). Even if Delaware courts recognized creditor standing for derivative suits against LLCs, the claim would belong to the trustee. Because a derivative suit is brought on behalf of the corporation, "the recovery, if any, flows only to the corporation." Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1036 (Del. 2004). When a corporation files for bankruptcy, this cause of action becomes property of the debtor's estate, "regardless of whether outside of bankruptcy the case was more likely to be brought by . . . a . . . creditor through a derivative suit." Torch Liquidating Trust ex rel. Bridge Assocs. L.L.C. v. Stockstill, 561 F3d 377, 385 (5th Cir. 2009) (citing Meyer v. Fleming, 327 U.S. 161, 167, 66 S. Ct. 382 (1946) ("The claim sought to be enforced in a derivative suit may be an important asset of the estate.").). Therefore, MTEK has no standing to assert this claim.

## D.

Gosnell also argues that MTEK lacks standing to bring its claim for constructive fraud. MTEK alleges that Gosnell owed MTEK a fiduciary duty and "took advantage of the trust and confidence of MTEK to the detriment of MTEK and to the benefit of [himself.]" (Compl. ¶¶ 156-57.) No matter if the Delaware Supreme Court would apply North Carolina or Oregon law to determine if this claim

23

belonged to the bankruptcy estate, the result would be the same – it would not.

The allegations within the constructive fraud claim (id. ¶¶ 155-59) are so vague that it is challenging to determine which specific factual allegations in the Complaint MTEK intends as support for this claim. Generally, though, it is likely that those allegations include Clayton's and Reid's assurances that Luxury Tec was adequately capitalized (id. ¶¶ 23-27), Clayton's representations that Luxury Tec changed its name to Mirrenium for strategic reasons while Gosnell, Clayton, and Reid intentionally concealed Luxury Tec's bankruptcy (id. ¶¶ 40, 41), Gosnell's, Clayton's, and Reid's knowledge that Mirrenium was insolvent when it entered into the Agreements with MTEK (id. ¶ 50), and Mirrenium's failure to honor its obligations under the Agreements despite assurances otherwise (id. ¶¶ 62, 70, 75, 76, 80).

Under North Carolina law,

> [A] claim brought by a creditor against a director of a corporation, alleging that the director has committed constructive fraud by breaching his fiduciary duty owed directly to the creditor, is a claim founded on injuries peculiar or personal to the individual creditor, and, therefore, is a claim that belongs to the creditor and not the corporation.

Keener Lumber Co., Inc. v. Perry, 560 S.E.2d 817, 823 (N.C. Ct. App. 2002); see also In re Bostic Constr., Inc., 435 B.R. at 64-66.

While the Court has found no Oregon case as on-point as Keener Lumber Co., Inc., Oregon courts would also likely find that if the constructive fraud claim were personal to the creditor, the claim would not belong to the bankruptcy estate

24

and, therefore, the bankruptcy trustee would not have standing to pursue it. See In re Green Valley Seeds, Inc., 27 B.R. 34, 36 (Bankr. D. Or. 1982) (explaining that "[t]he fact that third parties, the officers of the corporation, may have a liability to creditors does not mean that the corporation has a corresponding claim against third party officers" and citing Collier on Bankruptcy ¶ 541.10[8] (15th ed.) for the proposition that "[t]he trustee does not have the right to step into the shoes of an individual creditor and pursue that creditor's claim against an officer"); Collier on Bankruptcy ¶ 541.07[5] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("[W]here applicable law makes such obligations or liabilities run to the corporate creditors personally, rather than to the corporation, such rights of action are not assets of the estate under section 541(a) that are enforceable by the trustee.").

Here, MTEK has alleged that Clayton, Reid, and Gosnell owed MTEK a fiduciary duty because of Mirrenium's insolvency and, yet, induced MTEK to enter into and perform its obligations under the Agreements. Unlike MTEK's fraudulent transfer allegations, MTEK does allege a personal injury as a result of constructive fraud. Therefore, MTEK has standing under North Carolina and Oregon law to bring its claim of constructive fraud.

E.

Although MTEK does not have standing to bring claims for piercing the corporate veil, fraudulent transfer, or breach of fiduciary duty, there is a question as to the effect, if any, of the trustee's failure to assert these claims itself.

25

Bankruptcy law provides that a trustee may abandon property. See 11 U.S.C. § 554. A trustee may abandon property of the estate that is burdensome to the estate or of inconsequential value and benefit to the estate, after notice and a hearing. Id. § 554(a); see also Spiro v. Vions Tech., Inc., No. 8287-VCP, 2014 WL 1245032, *9 (Del. Ch. Mar. 24, 2014) (unpublished) (requiring the trustee to "provide sufficient notice to creditors for an abandonment to be valid under Section 554(a)"). In addition, a court may order that the trustee abandon such property on the request of a party in interest, after notice and a hearing. 11 U.S.C. § 554(b). Furthermore, unless a court orders otherwise, property scheduled under section 521(a)(1) that is not administered at the time of the closing of the case is abandoned to the debtor. Id. § 554(c). However, property that is not abandoned and is not administered in the case remains property of the estate. Id. § 554(d); see also Vucak v. City of Portland, 96 P.3d 362, 363 (Or. Ct. App. 2004) (citing 11 U.S.C. § 554(d) in support of the proposition that "[i]f . . . an unscheduled asset is not disposed of, then it becomes property of the bankruptcy estate"). Moreover, if a trustee does not know of property, it cannot abandon the property, because "[i]t is well established that 'abandonment presupposes knowledge.'" In re Hawk, 524 B.R. 706, 717-18 (Bankr. S.D. Tex. 2015) (quoting Guaranty Residential Lending, Inc. v. Homestead Mortg. Co., L.L.C., 463 F. Supp. 2d 651,

661 (E.D. Mich. 2006) (citing Collier on Bankruptcy ¶ 554.03 (15th rev. ed. 2006[10]))).  Therefore, the property would remain part of the estate. Id. at 717.

Here, there is no indication of notice of a hearing or a hearing to abandon claims. See In re The Mirrenium Grp., LLC, No. 14-11762-BLS (Bankr. D. Del.). Furthermore, the claims for piercing the corporate veil, fraudulent transfer, and breach of fiduciary duty are not scheduled as estate property such that they would be abandoned without administration once the case closed. See id. Doc. #3 (Summary of Schedules) & Doc. #3-1 (Statement of Financial Affairs).  Of course, it is also unreasonable to expect the debtor, represented here by Gosnell (see id. Doc. #3 at 14, Doc. #3-1 at 12), to disclose and schedule claims involving its members' misrepresentations and fraud.  Nevertheless, pursuant to 11 U.S.C. § 554(d), because these claims are not scheduled and were apparently not administered, when the case closed on January 20, 2015, those claims remained property of the estate.  In further support of this conclusion is the fact that had the trustee not known of the claims, it could not have abandoned them.  Therefore, the claims for piecing the corporate veil, fraudulent transfer, and breach of fiduciary duty remain property of the estate, while MTEK has standing to bring a claim for constructive fraud.

---

[10] Collier on Bankruptcy ¶ 554.03 (16th ed.) provides the same.

In addition to arguing that MTEK lacks standing to pursue several claims, Gosnell argues that MTEK's Complaint fails to state any claim against him. Rule 12(b)(6) requires that a complaint contain sufficient factual allegations "to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)). A claim is facially plausible if the "factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id., 129 S. Ct. at 1949. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" Id., 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 557, 127 S. Ct. at 1966). Furthermore, "labels and conclusion" or "a formulaic recitation of the elements of a cause of action" are insufficient. Id., 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 555, 127 S. Ct. at 1965). While a court reviewing a motion to dismiss pursuant to Rule 12(b)(6) assumes factual allegations are true, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." Id.

As above, because this Court exercises diversity jurisdiction over the instant action, it must apply North Carolina's choice of law rules with respect to MTEK's claims. Because MTEK lacks standing to bring its claims for piercing the corporate veil, fraudulent transfer, and breach of fiduciary duty, the Court's analysis of Gosnell's motion to dismiss pursuant to Rule 12(b)(6) will focus on MTEK's

remaining claims of fraud, constructive fraud, unfair and deceptive trade practices, civil conspiracy, negligent misrepresentation, and punitive damages.

North Carolina's Supreme Court "has consistently adhered to the lex loci [delicti ("lex loci")] rule in tort actions." Boudreau, 368 S.E.2d at 854. Therefore, the lex loci rule will be applied to MTEK's claims of fraud, constructive fraud, civil conspiracy, and negligent misrepresentation.[11] "For actions sounding in tort, the state where the injury occurred is considered the situs of the claim." Id. The North Carolina Court of Appeals has rejected a bright line rule that an injury is sustained where a corporation is headquartered. Harco Nat'l Ins. Co. v. Grant Thornton, LLP, 698 S.E.2d 719, 725-26 (N.C. Ct. App. 2010) (finding United Dominion Indus. v. Overhead Door Corp., 762 F. Supp. 126, 128 n.2 (W.D.N.C. 1991) persuasive). However, the court did acknowledge that the state of incorporation or place of business "may be useful for determining the place of a plaintiff's injury[,]" but only "in those rare cases where, even after a rigorous analysis, the place of injury is difficult or impossible to discern." Id. at 726.

The lex loci rule "requires application of the law of the state where the plaintiff has actually suffered harm." Id. at 725-26 (citing Lloyd v. Carnation Co., 301 S.E.2d 414, 418 (N.C. Ct. App. 1983) as applying Virginia law to a claim by a North Carolina plaintiff that the defendants deprived it of exclusive distribution in Virginia and United Va. Bank v. Air-Life Assocs., 339 S.E.2d 90, 94 (N.C. Ct. App.

---

[11] See infra at 30-31 (discussing application of choice of law rules for punitive damages and unfair and deceptive trade practices).

1986) as applying Virginia law when the defendants' actionable injury took place in Virginia where the plaintiff lender sold the collateral below the price promised to the defendants). In other words, "[t]he law of the State where the last act occurred giving rise to defendants' injury governs [the] action." United Va. Bank, 339 S.E.2d at 94.

The same rule governs the choice of law as to punitive damages. See Stetser v. TAP Pharm. Prods., Inc., 598 S.E.2d 570, 580 (N.C. Ct. App. 2004) (Martin, C.J.) (explaining that "the substantive law of the state where the injury occurred" applied, not only to determine liability for tort actions, but to determine "what damages were available to plaintiffs for any liability resulting from those claims").

However, perhaps because "[a]n action for unfair or deceptive acts or practices is the creation of statute[] . . . [and is] neither wholly tortious nor wholly contractual in nature[,]" there is a split in the North Carolina Court of Appeals on whether the lex loci rule or the "most significant relationship test" applies to the choice of law issue for unfair and deceptive trade practices. See id. (first alteration appears in Stetser) (noting split of authority between Andrew Jackson Sales v. Bi-Lo Stores, 314 S.E.2d 797, 799 (N.C. Ct. App. 1984) (applying the most significant relationship test) and United Va. Bank, 339 S.E.2d at 93 (applying the lex loci rule)). But see Caper Corp. v. Wells Fargo Bank, N.A., 578 F. App'x 276, 280 (4th Cir. 2014) (characterizing a claim of unfair and deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1 as a tort claim, noting that North Carolina's

choice of law rules for torts is lex loci delicti, but not analyzing the choice of law issue because the result under either possible state's laws was the same).

Some courts have explained, "when Andrew Jackson Sales was decided[,] there was a nationwide trend to apply the significant relationship test to torts in general, and the North Carolina Supreme Court's subsequent rejection of this trend in Boudreau indicates that North Carolina's courts would not be inclined to apply the significant relationship test to [unfair and deceptive trade practices] claims." Associated Packaging, Inc. v. Jackson Paper Mfg. Co., No. 10CVS745, 2012 WL 707038, at *5 (N.C. Bus. Ct. Mar. 1, 2012) (citing United Dominion Indus., 762 F. Supp. at 128 n.2); see also Martinez v. Nat'l Union Fire Ins. Co., 911 F. Supp. 2d 331, 338 (E.D.N.C. 2012) (recognizing that that "[t]he Supreme Court of North Carolina has yet to address the proper choice of law test for a UDTPA claim and the North Carolina Court of Appeals has issued conflicting decisions" and concluding that the North Carolina Supreme Court would apply the lex loci test to determine which state's law applies to a claim of unfair and deceptive trade practices). For the reasons stated in Associated Packaging, Inc. and Martinez, this Court will apply the lex loci test to the claim of unfair and deceptive trade practices.

A.

1.

a.

As with each of MTEK's remaining claims, the threshold issue related to

MTEK's fraud claim is which state's law applies according to the lex loci rule.

"The 'last act' necessary for a fraud claim is the reasonable reliance on the false

representation which causes the injury." Jordan v. Shaw Indus., Inc., No. 96-

2189, -2190, -2191, -2192, -2371, -2372, 1997 WL 734029, *3 (4th Cir. Nov.

26, 1997) (unpublished); see also, e.g., Bardes v. Mass. Mut. Life Ins. Co., No.

1:11CV340, 2011 WL 1790816, *7 (M.D.N.C. May 10, 2011) (quoting Jordan).

But see Rhone-Poulenc Agro S.A. v. Monsanto Co., 73 F. Supp. 2d 554, 555 n.2

(M.D.N.C. 1999) (quoting Restatement (First) of Conflict of Laws § 377 n.4, but

noting that, although the Restatement is quoted in Jordan, the court in Jordan

relied on an Illinois definition of fraud which "conflated into one element"

"'reasonable reliance'" and "'injury'" unlike North Carolina's definition which

separates the two elements such that injury is the last event required to make the

defendant liable).

In Parker v. Carl Gregory Automotive, No. 1:13CV00060, 2014 WL

1599476, *4 (W.D. Va. Apr. 21, 2014), Virginia plaintiffs viewed in Virginia an

alleged false television advertisement by the Tennessee-defendant car dealership

that everyone was approved for financing, upon which the plaintiffs reasonably

relied.  They also were in Virginia when a salesperson at the dealership made a

32

similar misrepresentation to them over the telephone, upon which they reasonably relied. Id. The plaintiffs traveled to Tennessee where they attempted to obtain financing from the dealership, were denied, and were unable to purchase a vehicle. Id. at *1. The "place of the wrong"[12] was Virginia because that is where the plaintiffs viewed the advertisement and heard from the salesperson the false information upon which they relied, so Virginia law applied to the plaintiffs' fraud claim. Id. at *4.

In its claim of fraud, MTEK alleges that Gosnell reasonably calculated to, intended to, and indeed did deceive MTEK when he "misrepresented material facts and concealed material facts from MTEK" including Luxury Tec's bankruptcy, its relationship with Mirrenium, and Mirrenium's financial condition. (Compl. ¶¶ 141, 142.) "In particular, . . . Gosnell participated in phone calls and emails where he either represented that Mirrenium was solvent and able to pay the debts that it incurred with MTEK, or where he failed to correct representations made by Clayton and others regarding Mirrenium's ability to pay." (Id. ¶ 143.) MTEK was deceived and suffered damages as a proximate result of Gosnell's fraud. (Id. ¶¶ 144, 147.)

Specifically, Gosnell is alleged to have spoken on the telephone with Thibeau (who presumably was at MTEK's offices in Oregon) on May 9, 2014 during which Gosnell "represented that Mirrenium was adequately capitalized" and "that Mirrenium would submit payment to MTEK 'soon' for the outstanding invoices" at

---

[12] Like North Carolina, Virginia uses the lex loci rule for choice of law issues on tort claims. Parker, 2014 WL 1599476, at *4.

which time Gosnell "knew that Mirrenium was grossly undercapitalized and insolvent[.]" (Id. ¶¶ 118, 119.)  MTEK did not know otherwise, because it did not have reason to believe Luxury Tec had filed for bankruptcy and Clayton had represented that the name change from Luxury Tec to Mirrenium was strategic rebranding. (Id. ¶¶ 36, 41.)  Because the allegations in the Complaint suggest that Thibeau – and MTEK – were in Oregon when they reasonably relied on Gosnell's representations, Oregon law applies to MTEK's claim of fraud.[13]

b.

Rule 9 of the Federal Rules of Civil Procedure requires that a plaintiff allege "with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b).  In Oregon, the elements of fraud are

> (1) A representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury.

Burgdorf v. Weston, 316 P.3d 303 (Or. Ct. App. 2013) (quoting Webb v. Clark, 546 P.2d 1078 (Or. 1976)).

Assuming that MTEK has pled with sufficient particularity the circumstances surrounding Gosnell's representation that Mirrenium was adequately capitalized,

_____

[13] Gosnell recognizes that North Carolina's choice of law rules require the application of the law of the state where MTEK sustained its injury. (Br. in Supp. at 16 n.8.)  Gosnell then simply states, "Thus, Oregon law (which is where Plaintiff is located) is cited where necessary[,]" (id.) but it is unclear to which claims Gosnell believes Oregon law necessarily applies.

34

there is no allegation that MTEK was proximately injured by this representation. MTEK is alleged to have entered the last of its Agreements with Mirrenium months earlier (id. ¶¶ 55-80) and, therefore, did not do any business with Mirrenium after or as a result of Gosnell's representation that Mirrenium was sufficiently capitalized.

Furthermore, there is no allegation that MTEK was proximately injured by relying on Gosnell's representation that Mirrenium would pay the outstanding invoices soon. MTEK has not alleged that it was prevented from collecting on those invoices or that any delay on their attempted collection as a result of Gosnell's representation harmed MTEK.

In addition, the allegations in the Complaint undercut the allegation that Gosnell knew or intended that Mirrenium would not be paying the invoices. MTEK alleges that "[s]hortly before it filed for bankruptcy [in July 2014, approximately two months after Gosnell's telephone conference with Thibeau], Mirrenium paid MTEK approximately $54,000 in total for the prototypes, delivery services, and installation services delivered to Luxury Tech in or around September 2013." (Id. ¶ 53.) And, "Defendants . . . submitted one payment for $30,000 to MTEK for monies owed under the Agreements." (Id. ¶ 95.) Therefore, MTEK has not sufficiently alleged fraud as to Gosnell's affirmative representations.[14]

---

[14] Even if the lex loci rule directed that the law of North Carolina applied, the result would be the same for the same reasons. See Forbis v. Neal, 649 S.E.2d 362, 387 (N.C. 2007) (quoting Ragsdale v. Kennedy, 209 S.E.2d 494, 500 (N.C. 1974) and the essential elements of fraud); see also Johnson v. Phoenix Mut. Life Ins. Co.,

Likewise, MTEK has not sufficiently pled its allegation of fraud based on Gosnell's failure to correct the representations of others regarding Mirrenium's ability to pay. As noted above, the only interaction Gosnell is alleged to have had with MTEK is his May 9, 2014 telephone call with Thibeau, a call in which no one else is alleged to have participated or made representations. MTEK alleges that Gosnell received telephone calls from Clayton and Reid in Thibeau's presence during which Clayton, Reid, and Gosnell "discussed many aspects of Mirrenium's business with MTEK" such that "Gosnell clearly knew that Mirrenium was ordering substantial goods and services from MTEK, even though Mirrenium . . . could not pay for those goods and services at the time they were ordered." (Id. ¶ 54.f.) In addition, MTEK alleges that Gosnell was copied on "relevant emails[.]" (Id. ¶ 30.)

"It is undisputed" under Oregon law that a "defendant must be under a duty to disclose" "[f]or non-disclosure to form the basis of a fraud claim[.]" BNSF Ry. Co. v. Albany & E. R.R. Co., 741 F. Supp. 2d 1184, 1205 (D. Or. 2010) (quoting Paulsell v. Cohen, No. 00-CV-1175-ST, 2002 WL 31496397, at *24 (Dr. Or. May 22, 2002) (quoting Gebrayel v. Transamerica Title Ins. Co., 888 P.2d 83, 89 (Or. Ct. App. 1995))). Although MTEK does not allege the existence of a fiduciary duty as part of its specific fraud allegations (see Compl. ¶¶ 140-148), it

_____

266 S.E.2d 610, 616 (N.C. 1980), questioned in part on other grounds, Myers & Chapman, Inc. v. Thomas G. Evans, Inc., 374 S.E.2d 385, 392 (N.C. 1988) (explaining that a promissory representation is actionable fraud if "it is made with intent to deceive the promisee, and the promisor, at the time of making it, has no intent to comply").

does allege elsewhere in the Complaint that, because of Mirrenium's insolvency, Gosnell owed MTEK a fiduciary duty (id. ¶ 151).  Under Oregon law, whether such a fiduciary duty exists is determined under the state of incorporation. See Munson v. Valley Energy Inv. Fund, U.S., LP, 333 P.3d 1102, 1119 (Or. Ct. App. 2014) (applying Colorado law to determine whether the plaintiffs' claims could be brought as direct claims against institutional investors and directors of a Colorado corporation).  As noted above, supra III.C., Delaware law does not permit direct actions by creditors of insolvent corporations nor even derivative actions by creditors of LLCs.  Therefore, MTEK's fiduciary duty allegations are insufficient to support the necessary allegation that Gosnell had a duty to disclose information to MTEK and, ultimately, that he committed fraud by failing to correct others' representations.[15]

## 2.

### a.

MTEK also alleges a claim of constructive fraud against Gosnell. Specifically, it alleges that Gosnell owed MTEK a fiduciary duty as a member of the insolvent Mirrenium, that Gosnell took advantage of MTEK's trust and confidence to MTEK's detriment and to Gosnell's benefit, and that Gosnell's constructive fraud proximately caused MTEK injury. (Compl. ¶¶ 156-158).  It is difficult to determine

---

[15] Had North Carolina law applied to MTEK's claim of fraud by omission, the result would have been the same for the same reasons. See Rahamankhan Tobacco Enters. Pvt. Ltd. v. Evans MacTavish Agricraft, Inc., 989 F. Supp. 2d 471, 477 (E.D.N.C. 2013) (explaining the elements of fraud by omission).

in which state the last act took place to give rise to MTEK's injury as a result of Gosnell's constructive fraud – North Carolina, the state in which Gosnell may have benefitted from the representations, or Oregon, the state in which Gosnell would have taken advantage of MTEK. The Court need not answer that question, because the application of Oregon and North Carolina law leads to the same result.

b.

Under North Carolina law, a plaintiff must allege "(1) facts and circumstances creating a relation of trust and confidence; (2) which surrounded the consummation of the transaction in which the defendant is alleged to have taken advantage of the relationship; and (3) the defendant sought to benefit himself in the transaction." Self v. Yelton, 688 S.E.2d 34, 39 (N.C. Ct. App. 2010). "[A] breach of fiduciary duty amounts to constructive fraud." Compton v. Kirby, 577 S.E.2d 905, 914 (N.C. Ct. App. 2003). North Carolina courts generally recognize two types of fiduciary relationships: "(1) those that arise from legal relations such as attorney and client, broker and client[,] . . . partners, principal, and agent, trustee and cestui que trust, and (2) those that exist as a fact in which there is confidence reposed on one side, and the resulting superiority and influence on the other." S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC, 659 S.E.2d 442, 451 (N.C. Ct. App. 2008). "[A]n ordinary debtor-creditor relationship generally does not give rise to such a special confidence[.]" Branch Banking & Trust Co. v. Thompson, 418 S.E.2d 694, 699 (N.C. Ct. App. 1992) cited in Dallaire v. Bank of Am., N.A., 760 S.E.2d 263, 267 (N.C. 2014)). As previously noted, here, the

only allegations of a relationship of trust and confidence are those forming the basis of MTEK's breach of fiduciary duty claim. While North Carolina has recognized that directors of an insolvent North Carolina corporation owe a fiduciary duty to creditors under certain circumstances, Keener Lumber Co., Inc., 560 S.E.2d 817, North Carolina courts look to the law of the state of incorporation to answer questions on "the relevant corporate governance general standard of care[,]" Bluebird Corp. v. Aubin, 657 S.E.2d 55, 63 (N.C. Ct. App. 2008). As before, because Delaware law does not recognize direct fiduciary claims against an insolvent corporation or even derivative claims by creditors against LLCs, these allegations would not suffice to support this necessary element of the constructive fraud claim under North Carolina law.

The Oregon Supreme Court "has expressed some skepticism about the theory [of constructive fraud.]" Kreidler v. Taylor, 473 F. Supp. 2d 1090, 1102 (D. Or. 2007) (quoting Pollock v. D.R. Horton, Inc.-Portland, 77 P.3d 1120 (Or. Ct. App. 2003)). However, the court has acknowledged that "[c]onstructive fraud usually arises from a breach of duty where a relationship of trust and confidence exists[.]" U.S. Nat'l Bank of Portland v. Guiss, 331 P.2d 865, 876 (Or. 1958)). A confidential relationship is one in which one person "has gained the confidence of the other and purports to act or advise with the other's interest in mind." Restatement (Second) of Trusts § 2 cmt. b (2016); see Kreidler, 473 F. Supp. 2d at 1102-03 (quoting Ingersoll v. Ingersoll, 502 P.2d 598, 600 (Or. 1972) and noting that the "Oregon Supreme Court has cited with approval" the definition of

39

confidential relationship in the Restatement (Second) of Trusts). A confidential relationship "is particularly likely to exist where there is a family relationship or one of friendship or such a relation of confidence as that which arises between physician and patient or priest and penitent." Restatement (Second) of Trusts § 2 cmt. b. Indeed, Oregon courts have found confidential relationships between a doctor and patient, a mother and daughter, a pastor and church member, and a husband and wife. See Kreidler, 473 F. Supp. 2d at 1103 (citing Oregon Supreme Court and Appellate Court cases).

However, here, the relationship alleged is a fiduciary one resulting from Mirrenium's insolvency. Oregon courts look to Delaware's law to determine if MTEK has sufficiently alleged a fiduciary duty, see Munson, 333 P.3d at 1119. As previously concluded, MTEK has not. Therefore, MTEK has failed to state a claim for constructive fraud against Gosnell under either North Carolina or Oregon law.

3.

a.

MTEK also alleges a claim of unfair and deceptive trade practices in violation of North Carolina General Statute § 75-1.1 et seq. MTEK does not allege any specific conduct within this claim that constitutes an unfair and deceptive trade practice, but, instead, "realleges and incorporates by reference the allegations of the preceding [172] paragraphs of this Complaint." (Compl. ¶ 173.) In opposition to Gosnell's Motion, though, MTEK argues that it has alleged that Gosnell, Clayton, and Reid formed Mirrenium pursuant to a fraudulent scheme (citing id. ¶¶ 54, 122-

40

23), that they deceived MTEK to induce it to do business with the insolvent Mirrenium (citing id. ¶¶ 96, 142, 144), that they represented that Mirrenium was adequately capitalized (citing ¶ 118), that they intentionally concealed Luxury Tec's bankruptcy filing from MTEK (citing ¶ 40, 141), and that they continued to enter into Agreements with MTEK despite Mirrenium's insolvency (citing ¶¶ 46-47, 54). (Br. in Opp'n at 16-17.) As a proximate result, MTEK was "damaged in the principal amount of $376,887.92 at a minimum." (Compl. ¶ 176). North Carolina (and Oregon) require that a plaintiff "suffer damages as a prerequisite for a[n] [unfair and deceptive trade practices] cause of action[.]" Synovus Bank v. Parks, No. 10CVS5819, 2013 WL 3965424, at *5 (N.C. Bus. Ct. July 30, 2013) (unpublished) (reviewing North Carolina law, along with South Carolina and Texas law); see N.C. Gen. Stat. § 75-1.1 et seq.; Or. Rev. Stat. § 646.638; Adamson v. WorldCom Commc'ns, Inc., 78 P.3d 577, 583 (Or. Ct. App. 2003). "Thus, the suffering of damages . . . would be the last event necessary to make [a] [p]laintiff liable under the relevant state unfair and deceptive trade practices acts." Synovus, 2013 WL 3965424, at *5. In Synovus, the South Carolina-resident defendants counterclaimed unfair and deceptive trade practices when a development in North Carolina where they purchased a lot was not completed, consequently leaving the defendants with a lot worth significantly less than they paid for it. Id. at *2, 6. The court explained that, although the defendants "would undoubtedly feel the economic loss" in South Carolina where they resided, the "damages [were] associated with a loss in value of the purchased property in North Carolina where

41

the property is located." Id. at *6.  Therefore, because the damages suffered

occurred in North Carolina, North Carolina law applied. Id.  Likewise, in United

Virginia Bank, the court found that the last act giving rise to the debtor-

defendants' counterclaim of unfair and deceptive trade practices was in Virginia

where the lender-plaintiff sold the collateral below the promised price. 339 S.E.2d

at 321.  "The defendants suffered no actionable injury until the plane was sold

below the promised price[]" in Virginia; therefore, Virginia law applied. Id.

Here, unlike in Synovus, there is no other location alleged where MTEK

would have suffered damages except in Oregon.  Therefore, Oregon law applies to

its unfair and deceptive trade practices claim.

b.

First, some courts dismiss a claim brought pursuant to North Carolina

General Statute § 75-1.1 et seq. when the courts determine that North Carolina

law does not apply to the alleged unfair trade practices. See, e.g., Martinez, 911 F.

Supp. 2d at 338 (dismissing claim without prejudice because North Carolina law

did not govern the claim); United Dominion Indus., Inc., 762 F. Supp. at 131

(dismissing claim because North Carolina law did not apply, but permitting the

plaintiff leave to amend to bring a Texas-based claim in lieu of the action under

N.C. Gen. Stat. § 75-1.1).  However, even if MTEK were to amend its Complaint

to assert a claim under Oregon's unfair trade practices act, the factual allegations

against Gosnell would be insufficient.

42

In Oregon, to state a claim for unfair trade practices under Oregon Revised Statutes § 646.638, a plaintiff "must plead that the alleged misrepresentation was 'willful[,] . . . [meaning] that the defendant knew [or should have known] of the falsity of a representation[.]" Adamson v. WorldCom Commc'ns, Inc., 78 P.3d 577, 583 (Or. Ct. App. 2003). A representation includes not only "any assertion by words or conduct" but also "a failure to disclose a fact." Pearson v. Philip Morris, Inc., 361 P.3d 3, 22 (Or. 2015) (quoting Or. Rev. Stat. § 646.608(2)). In addition to alleging a willful misrepresentation, a plaintiff must allege that it suffered an "'ascertainable loss of money or property, real or personal, as a result of' an unlawful trade practice." Adamson, 78 P.3d at 583 (citing Or. Rev. Stat. § 646.638).

The only assertive representations that Gosnell is alleged to have made – that Mirrenium was adequately capitalized and would be paying MTEK's outstanding invoices soon – were made during his telephone call with Thibeau on May 9, 2014. As explained above, supra IV.A.1.b., MTEK did not enter into any more Agreements with Mirrenium after January 2014 and, thus, has not alleged that it was injured by doing any more business with Mirrenium in reliance on Gosnell's statement. In addition, there are no allegations that MTEK was injured by Gosnell's representation that Mirrenium would be paying MTEK's invoices soon. Therefore, assuming that MTEK has alleged that Gosnell's representations were

willful, MTEK has not alleged that it suffered any ascertainable loss of money as a result of anything that Gosnell said to Thibeau.[16]

Furthermore, while MTEK argues in support of its claim that Gosnell, along with Clayton and Reid, concealed Luxury Tec's bankruptcy filings from MTEK and alleges elsewhere in the Complaint that "despite opportunities to do so, Gosnell failed to notify MTEK that [Clayton's and Reid's] representations were false[,]" the factual allegations against Gosnell do not support a claim for misrepresentation by omission.  Gosnell is not alleged to have initiated the business relationship between MTEK and Luxury Tec, to have ever been present during any meeting with MTEK, to have negotiated the terms of any of the Agreements, to have entered into any of the Agreements on behalf of Mirrenium, or to have ever communicated with MTEK other than during his May 9, 2014 telephone call with Thibeau.  While MTEK's allegations may support such a claim against Clayton, they do not against Gosnell.

4.

a.

MTEK also alleges that Gosnell entered into a civil conspiracy with Clayton and Reid by agreeing "to commit fraud and other unjust and deceptive acts" as alleged in the Complaint and engaging "in one or more overt acts" as "described

---

[16] Were North Carolina law to apply to this claim, the result would be the same. See Bumpers v. Comty. Bank of N. Va., 747 S.E.2d 220, 226 (N.C. 2013) (providing the necessary elements); Bob Timberlake Collection, Inc. v. Edwards, 626 S.E.2d 315, 322-23 (N.C. Ct. App. 2006) (defining unfair and deceptive).

with greater particularity" in the Complaint, proximately causing "substantial loss, damage, and harm" to MTEK. (Compl. ¶¶ 179-82.)  The last act of the conspiracy to take place that caused MTEK injury was in Oregon.  While Gosnell, Clayton, and Reid would presumably have entered into their agreement to commit fraud in North Carolina, MTEK would have been injured by that agreement in Oregon for the same reasons that it was injured in Oregon as a result of Gosnell's fraud. See Morasch v. Hood, 222 P.3d 1125, 1132 (Or. Ct. App. 2009) (noting that the plaintiff's conspiracy claim was based on the defendants' fraud "and thus, any damages for the conspiracy would be based wholly on damages as a result of the underlying fraud").

b.

In Oregon, "civil conspiracy is not, itself, a separate tort for which damages may be recovered; rather it is a way in which a person may become jointly liable for another's tortious conduct." Id. at 1132.  Civil conspiracy involves "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as a result of the over acts." Id. at 1131-32; see also Yanney v. Koehler, 935 P.2d 1235, 1239 (Or. Ct. App. 1997) (citing Bonds v. Landers, 566 P.2d 513, 516 (Or. 1977) for the proposition that "the primary purpose of a civil conspiracy must be to cause injury to another"). "[A] defendant personally need not have committed a tortious act as a prerequisite to liability for acting in concert with another person who did commit that tortious act." Granewich v. Harding, 985 P.2d 788, 794 (Or.

45

1999).  However, if there is no conspiracy, only the defendants who personally committed the tortious act can be liable. Id. at 795.

As part of a portion of the Complaint entitled "Gosnell . . . Conspired with Clayton and Reid to Defraud MTEK[,]" MTEK alleges that Gosnell "was informed about" and "exercised significant control" over Mirrenium's business, "played a key role" in Mirrenium's fraud, "materially participated in the representations to third parties that Mirrenium was adequately funded[,]" received telephone calls from Clayton and Reid who "discussed billing, purchasing, and related issues with him[,]" was copied on emails with MTEK's invoices attached, and told Thibeau that Mirrenium would pay MTEK's outstanding invoices. (Compl. ¶¶ 104-18.)  These allegations culminate in the allegation that "Gosnell engaged in a scheme with Reid and Clayton to defraud MTEK[.]" (Id. ¶ 122.)  Missing from these allegations is any factual allegation that Gosnell had a meeting of the minds with Clayton and/or Reid to commit fraud and other unjust, deceptive acts.  The only allegations that Gosnell entered into an agreement with Clayton and Reid to defraud MTEK are conclusory and, therefore, cannot support a claim for civil conspiracy.[17]

---

[17] Even if North Carolina law applied, MTEK's claim against Gosnell for civil conspiracy would fail for the same reason. See Stetson, 598 S.E.2d at 581, 582 (providing the elements of a civil conspiracy and that the making of the agreement is sufficient to constitute a conspiracy).

5.

a.

MTEK also alleges that Gosnell "engaged in negligent misrepresentations" when he "supplied [false] information to MTEK regarding Mirrenium, including information regarding the relationship between Luxury Tec and Mirrenium, and the financial condition of Mirrenium[,]" "failed to use reasonable care or competence in obtaining or communicat[ing] the information[,]" "intended MTEK to rely on that information[,]" and proximately caused MTEK harm. (Compl. ¶¶ 187-92.) The last act giving rise to a plaintiff's injury as a result of negligent misrepresentation is the plaintiff's detrimental reliance on the information. Associated Packaging, Inc., 2012 WL 707038, at *6 (citing Bob Timberlake Collection, Inc., 626 S.E.2d at 321 (citing Raritan River Steel Co. v. Cherry Bekaert & Holland, 367 S.E.2d 609, 612 (N.C. 1988))); see also Jefferson-Pilot Life Ins. Co. v. Spencer, 442 S.E.2d 316, 320 (N.C. 1994) ("[A]n action for negligent misrepresentation . . . does not accrue before the misrepresentation is discovered, neither does it accrue until the misrepresentation has caused claimant harm.") quoted in Harco Nat'l Ins. Co., 698 S.E.2d at 724.

In Harco, the plaintiff, an Illinois insurance company, sued the defendant, a Pennsylvania auditor, for negligence and negligent misrepresentation for providing audit opinions of a Pennsylvania bonding company with whom the plaintiff had entered into an agreement. 698 S.E.2d at 689, 690. The bonding company stopped making payments it agreed to make to courts where bonds issued in the

47

plaintiff's name were forfeited when bonded individuals failed to appear. Id. at 689-90. Consequently, the plaintiff was required to pay all of the outstanding forfeited bonds, and the North Carolina Department of Insurance seized the plaintiff's trust account funds at its North Carolina bank to satisfy the outstanding bond obligations. Id. at 690. The plaintiff made additional payments funded primarily from the plaintiff's corporate bank account in Illinois. Id. The court determined that the cause of action accrued when the North Carolina Department of Insurance seized the plaintiff's trust funds held in a North Carolina trust account in a North Carolina bank. Id. at 698. Therefore, because the funds were located in North Carolina at the time of seizure, the plaintiff suffered the necessary injury in North Carolina whose law would apply to the claim. Id.

Here, the last act giving rise to MTEK's injury as a result of Gosnell's negligent misrepresentation would have been in Oregon, where MTEK discovered and detrimentally relied on the misrepresentation. According to the allegations in the Complaint, it is in Oregon that MTEK would have learned that Mirrenium could not pay all of MTEK's outstanding invoices because Mirrenium was not adequately capitalized as MTEK had been led to believe. Therefore, Oregon law applies to MTEK's claim of negligent misrepresentation.

b.

In Oregon, a claim for negligent misrepresentation "must be predicated on some duty of the negligent actor to the injured party beyond the common law duty to exercise reasonable care to prevent foreseeable harm." Ave. Lofts Condos.

48

Owners' Ass'n v. Victaulic Co., 24 F. Supp. 3d 1010, 1018 (D. Or. 2014) (quoting

Onita Pac. Corp. v. Trs. of Bronson, 843 P.2d 890, 896 (Or. 1992)).  "In other

words, for the duty to avoid making negligent misrepresentations to arise, the

parties must be in a 'special relationship,' in which the party sought to be held

liable had some obligation to pursue the interests of the other party." Id. (quoting

Conway v. Pac. Univ., 924 P.2d 818 (Or. 1996)).  Special relationships arise when

a professional acts, at least in part, to further the economic interests of the client

such as between an attorney and his client, engineers or architects and their

clients or intended beneficiaries, and an agent and his principal. Onita Pac. Corp.,

843 P.2d at 897; see also Conway, 924 P.2d at 823-24 (recognizing special

relationships may exist between a physician and his patient, a trustee and its

beneficiaries, pledgees and pledgers, and a liability insurer that has undertaken the

duty to defend and its insured).  On the other hand, when the relationship is

adversarial where the "parties negotiat[e] at arm's length to further their own

economic interests[,]" "negligent misrepresentation is not actionable." Onita Pac.

Corp., 843 P.2d at 897, 899.

       Here, the facts do not allege a special relationship between MTEK and

Gosnell.  Unlike the special relationships recognized by Oregon courts where, for

example, one party acts to further the economic interests of the other, the facts

here allege an adversarial relationship in which MTEK and Mirrenium negotiated at

arm's length the terms of the Agreements.  To the extent that the facts suggest

that Gosnell negotiated with MTEK (see, e.g., Compl ¶ 118), it was at arm's

49

length and certainly not for the purpose of furthering MTEK's economic interests. The fiduciary duty that MTEK alleges Gosnell owed MTEK as a result of Mirrenium's insolvency is not the type of special relationship that would serve as the basis of a negligent misrepresentation claim.

Furthermore, despite MTEK's allegation that Gosnell gave information to MTEK about Mirrenium's relationship with Luxury Tec and Mirrenium's financial condition, the only representations Gosnell is alleged to have made to MTEK were during his May 9, 2014 telephone call with Thibeau when he told Thibeau that Mirrenium was adequately capitalized and would pay MTEK's invoices soon (id. ¶ 118). As explained above, supra IV.A.1.b., that conversation took place months after MTEK entered into its final Agreement with Mirrenium (see id. ¶¶63-68, 71-78), after which MTEK is not alleged to done any more business with Mirrenium. There is also no allegation that MTEK was harmed by relying on Gosnell's representation that Mirrenium would pay the outstanding invoices soon.[18] Therefore, MTEK has failed to state a claim for negligent misrepresentation.

---

[18] For these reasons and others, MTEK's claim for negligent misrepresentation would also fail under North Carolina law. See Raritan River Steel Co., 367 S.E.2d at 612 (explaining that "negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care"); Eastway Wrecker Serv., Inc. v. City of Charlotte, 599 S.E.2d 410, 414 (N.C. Ct. App. 2004) (requiring that a plaintiff alleging negligent misrepresentation also allege that he was denied the opportunity to investigate or that he could not have learned the truth by exercise of reasonable diligence).

6.

a.

 MTEK also alleges a claim for punitive damages because "Gosnell engaged in fraud and willful and wanton conduct with complete disregard for the rights of MTEK." (Compl. ¶ 195). Because MTEK's tort actions were analyzed under Oregon and North Carolina law, so, too, will its claim for punitive damages be analyzed under both states' law.

b.

 The "general rule" in North Carolina is that punitive damages "do not and cannot exist as an independent cause of action[.]" Iadanza v. Harper, 611 S.E.2d 217, 223 (N.C. Ct. App. 2005). However, punitive damages may be awarded if the plaintiff proves both that the defendant is liable for compensatory damages and that fraud, malice, or willful or wanton conduct relate to the plaintiff's compensable injury. N.C. Gen. Stat. § 1D-15(a) (2015); see also id. § 1D-1 (providing that "[p]unitive damages may be awarded, in an appropriate case and subject to [other statutory provisions], to punish a defendant for egregiously wrongful acts and to deter the defendant and others from committing similar wrongful acts"). The defendant himself must have participated in the aggravating conduct and cannot be liable for punitive damages solely on the basis of another's acts or omissions. Id. § 1D-15(c). Here, MTEK has not sufficiently alleged an underlying claim against Gosnell, which includes its attempt to allege a claim of fraud. There are no factual allegations that Gosnell committed egregiously

51

wrongful acts. Under North Carolina law, MTEK has not stated a claim for punitive damages.

Likewise, under Oregon law, MTEK has failed to state a claim for punitive damages. As in North Carolina, without an independent claim for which the plaintiff can recover, there can be no punitive damages. See Express Creditcorp. v. Oregon Bank, 767 P.2d 493, 495-96 (Or. Ct. App. 1989) (affirming directed verdict on punitive damages when there was "no independent claim for which a jury could have awarded punitive damages"). Even with an independent claim as the basis for recovery, a plaintiff seeking punitive damages must show that the defendant "acted with malice or [showed] a reckless and outrageous indifference to a highly unreasonable risk of harm and . . . acted with a conscious indifference to the health, safety and welfare of others." Or. Rev. Stat. § 31.730(1) (2016). As above, not only has MTEK failed to allege successfully an independent claim against Gosnell, but, even if it had, there are no factual allegations that he acted in such a way that the statute requires. As such, MTEK's claim for punitive damages fails under both North Carolina and Oregon law.

B.

Therefore, because MTEK has failed to state a claim for fraud, constructive fraud, unfair and deceptive trade practices, civil conspiracy, negligent misrepresentation, and punitive damages upon which relief can be granted, these claims are dismissed.

IV.

For the reasons stated herein, IT IS HEREBY ORDERED that Defendant John W. Gosnell's Motion to Dismiss Plaintiff's Second Amended Complaint [Doc. #26] be GRANTED.

This the 23rd day of May, 2016.


                                        /s/ N. Carlton Tilley, Jr.
                                   Senior United States District Judge