IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| M-TEK KIOSK, INC., ) | | |
| ) | | |
| Plaintiff, ) | | |
| v. ) | | |
| ) | | |
| RYAN CLAYTON and JOHN W. ) | 1:15CV886 | |
| GOSNELL, ) | | |
| ) | | |
| Defendants. ) | | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on a Motion for Default Judgment against Defendant Ryan Clayton [Doc. #44] by Plaintiff M-Tek Kiosk, Inc. ("MTEK"). On October 30, 2014, MTEK filed a Complaint against Clayton and John W. Gosnell, and, on November 4, 2014, summons was served on Clayton. (Compl. [Doc. #1]; Executed Summons [Doc. #3].) After Clayton failed to answer or otherwise respond, MTEK moved for an entry of default. (See Mot. for Entry of Default [Doc. #9].) On December 8, 2014, the Clerk entered default against Clayton.[1] (See Entry of Default [Doc. #10].) On August 12, 2016, MTEK moved for a default judgment against Clayton. In its motion, MTEK seeks (1) trebled compensatory damages in the amount of $1,130,663.76 or actual and punitive damages totaling

---

[1] MTEK filed this action in the Western District of North Carolina. At the time that MTEK sought an entry of default against Clayton, the action was pending in that court so the Clerk for the Western District of North Carolina entered default against Clayton. The following year, in October 2015, the case was transferred to the Middle District of North Carolina where all motions then-pending and since filed have been or are being addressed.

the same amount; (2) pre-judgment interest at a rate of 8% per annum; (3) post-judgment interest as provided in 28 U.S.C. § 1961; and (4) attorneys' fees. For the reasons explained below, MTEK's motion is denied as to attorneys' fees, but otherwise granted.

As a result of Clayton's default, the well-pled factual allegations in the Complaint are admitted.[2] See Ryan v. Homecomings Fin. Network, 253 F.3d 778, 780 (4th Cir. 2001). However, allegations with respect to damages are not deemed admitted. See Fed. R. Civ. P. 8(b)(6) ("An allegation – other than one relating to the amount of damages – is admitted if a responsive pleading is required and the allegation is not denied.") A court may hold a hearing pursuant to Rule 55(b)(2)(B) of the Federal Rules of Civil Procedure to determine damages, but "may also award damages based on affidavits and documentary evidence." Masco Corp. v. Bennett, No. 3:08-cv-161-RJC-DCK, 2010 WL 1405136, at *2 (W.D.N.C. Mar. 31, 2010). Here, in addition to the allegations, MTEK has submitted an affidavit with accompanying documentary evidence in support of damages, [see Docs. #45-1, 45-4 to 45-15], such that a hearing is not necessary.

I.

Clayton, a citizen of North Carolina, held a 36.50913% ownership interest in Luxury Tec, LLC ("Luxury Tec"), a company that also went by the name of Mirrus.

---

[2] Although there are two subsequent complaints in this action, default was entered against Clayton as to the original Complaint. Therefore, the admitted facts are those from the original Complaint.

2

(Compl. ¶¶ 8, 14.) Clayton was the Senior Vice President of International Business for Mirrus, a technology company that developed and sold digital advertising media to commercial retail companies. (Id. ¶¶ 15, 16.) In May 2013, Clayton reached out to David Thibeau, president of MTEK, an Oregon corporation, about Mirrus's purchasing specialized electronic equipment from MTEK. (Id. ¶¶ 4, 31.) In July 2013, Clayton met again with Thibeau and other MTEK representatives and toured MTEK's facilities in Oregon at which time Clayton and Thibeau discussed various projects. (Id. ¶ 32.) Following that meeting, MTEK and Mirrus reached an agreement for MTEK to develop and deliver prototypes, which it did by September 2013. (Id. ¶¶ 33, 34.) In September and October 2013, Clayton travelled to Oregon multiple times to discuss additional projects. (Id. ¶¶ 35, 36.) During this time period, Clayton represented to Thibeau and MTEK that Mirrus was adequately capitalized and had secured a $3 million line of credit for purchasing equipment and provided MTEK with a list of Mirrus's investors who had provided operational funding. (Id. ¶¶ 37-40.) MTEK reasonably relied on Clayton's representations, which Clayton knew to be false at the time he made them. (Id. ¶¶ 42, 43.) He intended to induce MTEK to design and deliver the electronic products and services to Mirrus. (Id. ¶ 41.) In other words, on behalf of Mirrus, Clayton entered into agreements with MTEK while knowing that Mirrus was insolvent and incapable of paying for the products and services that it purchased. (Id. ¶ 55.)

On November 14, 2013, Luxury Tec filed for bankruptcy. (Id. ¶ 46.) The previous day, The Mirrenium Group, LLC ("Mirrenium") had been formed in

3

Delaware with Clayton holding a 29.80515% ownership interest and serving among its principal members and as its Chief Technology Architect and Managing Director of Global Markets. (Id. ¶¶ 18, 20-22, 130-31.) Mirrenium was formed to operate as the functional successor of Mirrus, but Clayton knew it was undercapitalized when it was formed. (Id. ¶¶ 54, 138.) He did not disclose to MTEK that Mirrus[3] had filed for bankruptcy and, instead, intentionally concealed the bankruptcy filing. (Id. ¶ 51.) He also represented to MTEK that Mirrus had changed its name to Mirrenium as a strategic branding decision. (Id. ¶ 52.) Just as he had with Mirrus, Clayton then entered into agreements on behalf of Mirrenium with MTEK even though he knew that Mirrenium was insolvent and could not pay for the products and services that it purchased. (Id. ¶¶ 55, 139.)

Specifically, in the fall of 2013, Clayton informed Thibeau that he needed countertop units for Estee Lauder Companies, Inc. and The LIDS Sports Group ("LIDS"). (Id. ¶¶ 58-59.) From September through December 2013, Clayton and representatives from MTEK met in person and communicated over the telephone and email about those countertop units and ultimately entered into an agreement according to which Clayton would purchase from MTEK ten units for $29,411.47. (Id. ¶¶ 60-62.) After MTEK delivered those units on December 2, 2013, Thibeau emailed Clayton documenting the specifics of the completed order for which MTEK also provided Clayton an invoice. (Id. ¶¶ 63-66.) From March through June of

---

[3] The references in this Opinion to Mirrus's bankruptcy, as opposed to consistent references to Luxury Tec's bankruptcy, mirror MTEK's specific allegations.

4

2014, MTEK attempted numerous times to collect payment from Clayton, which he failed to remit. (Id. ¶¶ 67-68.)

Beginning in November 2013, Clayton discussed with MTEK representatives in person and over the telephone and email the purchase of six LCD units for the Chicago Paul Mitchell store for which Clayton and MTEK eventually entered into a written agreement. (Id. ¶¶ 69-77.) After MTEK delivered the units, it sent Clayton an invoice totaling $11,528.65. (Id. ¶¶ 78-80.) As above, from March through June 2014, MTEK was unsuccessful in its numerous attempts to collect payment from Clayton. (Id. ¶¶ 81-82.)

From September 2013 through January 2014, Clayton discussed with MTEK representatives in person and over the telephone and email the purchase of "2260 Display" units and countertop units for Macy's and LIDS. (Id. ¶¶ 83-89.) Ultimately, Clayton and MTEK entered into a written agreement for the purchase of fifty countertop units for a total price of $135,830.17 and entered into a separate written agreement for the purchase of thirty 2260 Display units for a total price of $159,474.93. (Id. ¶¶ 90-91.) On December 12, 2013, Clayton notified MTEK that a colleague would be "sending out a $30,000 check for the start of the LIDs/Macys [sic] deal." (Id. ¶ 93.) On December 30, 2013, he emailed MTEK, stating in part: "Can you generate an invoice for the $30k initial payment on the Macy's/Lids install we discussed for December and then a 2nd one for $40,000 for January. . . . We will send checks out this week once I get these." (Id. ¶ 94.) MTEK provided those invoices and others and delivered the units as agreed. (Id. ¶¶

5

95-107.)  As it was doing for its other agreements with Clayton, from March through June 2014, MTEK attempted numerous times to collect payment from Clayton, which he failed to remit. (Id. ¶¶ 108-11, 114-15, 117-18.)

In July 2014, Mirrenium filed for bankruptcy. (Id. ¶¶ 26, 127, 161.)  In total, Clayton owes MTEK $376,887.92. (Id. ¶¶ 119-120; see also Invoice Nos. 6505, 6522, 6550, 6552, 6553, 6577, 6578, 6590, 6651-54 [Docs. #45-4 to 45-15]; Aff. of Gary Beaver ¶¶ 12, 19 [Doc. #45-1].)  The agreements[4] between MTEK and Clayton state, in part, "In return for MTEK extending credit under this Agreement, you jointly and severally agree to pay for all the purchases pertaining to this agreement and all other charges . . . according to the terms of this agreement." (Id. ¶ 122.)  The agreements also provide,

> You are in default of this agreement if you: (a) fail to pay the balance due by the due date, (b) breach any other term or condition of this agreement, (c) have made a material misrepresentation or misstatement in the Application, financial statement or other

---

[4] In his affidavit, Beaver avers that each of the agreements between Clayton and MTEK are attached to his affidavit as Exhibits O, P, and Q. (See Aff. of Gary Beaver ¶ 13.)  He then quotes from the agreements and cites to those exhibits. (See id. ¶¶ 14-16.)  However, those exhibits do not appear to be the written agreements between Clayton and MTEK, as they are not signed by Clayton or anyone else on his or Mirrenium's behalf.  Instead, they appear to be quotes from MTEK for its products and services.  Furthermore, even if those were the written agreements between Clayton and MTEK, they were not attached to the original Complaint such that Clayton would have had the opportunity to respond to their content at that time.  Therefore, the documents attached to Beaver's affidavit as Exhibits O, P, and Q have not been considered as part of this Memorandum Order. Nevertheless, for the purposes of MTEK's motion for default judgment, the allegations of the original Complaint sufficiently allege facts surrounding the agreements into which Clayton and MTEK entered such that those exhibits are not necessary for the determination of liability and, because of the invoices attached to the affidavit, are also not necessary for the determination of damages.

6

> document submitted to us in connection with this agreement, (d) become the subject of a bankruptcy, receivership, or other insolvency proceeding.

(Id. ¶ 123.) MTEK performed its obligations under the agreements, but Clayton breached the agreements by (1) not timely and fully remitting payment to MTEK, (2) falsely and deceptively representing that Mirrus and Mirrenium were adequately capitalized, (3) and Mirrenium's filing for bankruptcy on July 21, 2014. (Id. ¶¶ 124-27.)

In addition, despite owing money to MTEK and knowing Mirrenium was insolvent, Clayton took advantage of his position as a corporate officer and acted in his own self-interest rather than the interest of Mirrenium by misappropriating corporate funds. (Id. ¶ 140-41.) Specifically, between December 5, 2013 and April 7, 2014, Mirrenium made self-payments to Clayton of at least $72,486.65. (Id. ¶¶ 142, 146-47.)

II.

Although MTEK's well-pled allegations are deemed admitted, the Court must still "determine whether the well-[pled] allegations in [the] complaint support the relief sought in this action." Ryan, 253 F.3d at 780. MTEK seeks trebled compensatory damages in the amount of $1,130,663.76 or actual and punitive damages totaling the same amount, pre-judgment interest, post-judgment interest, and attorneys' fees.

A federal court with diversity jurisdiction must apply the choice-of-law rules of the forum state. Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487, 496

7

(1941) <u>superseded by statute on other grounds</u>. For a breach of contract claim, North Carolina's choice-of-law rules dictate that the law of the state where a contract was made governs the issue of breach of contract. Unfortunately, here, there are no allegations about where the agreements were formed. Yet, because (a) the agreements could have been formed in North Carolina, (b) MTEK assumes North Carolina law applies to its claims, and, (c) by not responding, Clayton has made no argument that any other state's law applies, North Carolina law is applied to the breach of contract claim. Likewise, North Carolina law is applied to the award of punitive damages and the finding of fraud as an aggravating factor in support of such an award. MTEK relies on North Carolina law in support of its claim for punitive damages, and, as before, by not responding otherwise, Clayton has failed to argue that any other state's law applies.

A.

MTEK's allegations support relief for a breach of contract. See <u>Johnson v. Colonial Life & Accident Ins. Co.</u>, 618 S.E.2d 867, 870 (N.C. Ct. App. 2005) (listing the elements of a breach of contract claim as "(1) existence of a valid contract, and (2) breach of the terms of that contract"). MTEK has alleged the existence of four valid contracts, the performance of its obligations under each agreement, and Clayton's breach of the terms of each agreement. MTEK has also provided a copy of each of the invoices associated with the agreements that total $376,887.92, the amount that Clayton is alleged to owe.

B.

The allegations further support an award of punitive damages that, together with the actual damages of $376,887.92, total $1,130,663.76. Punitive damages may be awarded "to punish a defendant for egregiously wrongful acts and to deter the defendant and others from committing similar wrongful acts." N.C. Gen. Stat. § 1D-1. Punitive damages may only be awarded, though, if the defendant is liable for compensatory damages and the plaintiff proves by clear and convincing evidence that either fraud, malice, or willful or wanton conduct was an aggravating factor related to the injury for which compensatory damages were awarded. Id. §§ 1D-15(a), (b). The burden of clear and convincing evidence is "more exacting than the preponderance of the evidence standard . . . , but less than the beyond a reasonable doubt standard . . . ." Scarborough v. Dillard's, Inc., 693 S.E.2d 640, 643 (N.C. 2009). Punitive damages may not be awarded solely on the basis of vicarious liability or solely for breach of contract. N.C. Gen. §§ 1D-15(c), (d). Nor may punitive damages be greater than three times the amount of compensatory damages or two hundred fifty thousand dollars, whichever is greater. Id. § 1D-25(b).

MTEK's allegations support a finding of fraud as the aggravating factor in support of an award of punitive damages. Under North Carolina law, the "essential elements of actionable fraud are well established: (1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the

9

injur[ed] party." Ragsdale v. Kennedy, 209 S.E.2d 494, 500 (N.C. 1974). Clayton reached out to Thibeau as early as May 2013 and, over the course of several visits to MTEK's facilities in Oregon and months of communications with MTEK's representatives, developed a business relationship with Thibeau and MTEK. During this time, Clayton represented that Mirrus was adequately capitalized, had a $3 million line of credit, and had operational funding investment. Yet, Clayton knew those representations were false and intended to induce MTEK into doing business with Mirrus even though, unbeknownst to MTEK, Mirrus was insolvent and incapable of paying for MTEK's products and services. Clayton intentionally concealed Mirrus's bankruptcy from MTEK and, instead, represented that the name change to Mirrenium was strategic. Although Clayton knew that Mirrenium was undercapitalized at the time of its formation, he entered into agreements on its behalf with MTEK knowing that Mirrenium was insolvent and could not pay for MTEK's products and services. Eventually, Mirrenium, too, filed for bankruptcy. As a result of Clayton's intentional and deceptive misrepresentations, MTEK is owed $376,887.92. These admitted allegations of fraud support an award of $753,775.84 in punitive damages, twice the compensatory damages. Together, compensatory and punitive damages total $1,130,663.76.

C.

MTEK also seeks pre-judgment interest on damages sustained from Clayton's breach of contract. North Carolina law "authorizes the award of pre-judgment interest on damages from the date of the breach at the contract rate, or

10

the legal rate if the parties have not agreed upon an interest rate." Cleveland Constr., Inc. v. Ellis-Don Constr., Inc., 709 S.E.2d 512, 523 (N.C. Ct. App. 2011) (citing N.C. Gen. Stat. § 24-5(a)).  The legal rate of interest is eight percent. N.C. Gen. Stat. § 24-1.  As MTEK recognizes, it is "only entitled to pre-judgment interest on the breach of contract damages," not also on the punitive damages. Cf. Johnson, 618 S.E.2d at 872 (noting that "a pre-judgment interest award should not attach to the trebled damages, but only to the actual damages awarded for the breach of contract that was found to be an unfair trade practice").  Although MTEK alleges that Clayton breached the agreements in various ways, it specifically alleges in the Complaint and asks the Court to find that the date of breach is July 21, 2014, the date that Mirrenium filed for bankruptcy.  Therefore, MTEK is entitled to pre-judgment interest at a rate of eight percent on $376,887.92 from July 21, 2014, the date of Clayton's breach, to the date of the entry of the judgment.

D.

MTEK also seeks post-judgment interest.  Unlike pre-judgment interest, in diversity cases, federal law governs the determination of post-judgment interest, which applies to the entire money judgment. Hitachi Credit Am. Corp. v. Signet Bank, 166 F.3d 614, 633 (4th Cir. 1999).  The Fourth Circuit has explained that "awarding post-judgment interest on the entire amount the court awarded [the plaintiff], including pre-judgment interest, most closely comports with the purpose of post-judgment interest articulated by the Supreme Court." Quesinberry v. Life

11

Ins. Co. of N. Am., 987 F.2d 1017, 1031 (1993) (referring to the Supreme Court's opinion in Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 835 (1990) in which the Court stated, "[T]he purpose of postjudgment interest is to compensate the successful plaintiff for being deprived of compensation for the loss from the time between the ascertainment of the damages and the payment by the defendant"). The post-judgment interest is "calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the [Federal Reserve], for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961(a). The interest is to "be computed daily to the date of payment" and is "compounded annually." 28 U.S.C. § 1961(b). Accordingly, MTEK is entitled to post-judgment interest at a rate of 1.03 percent on the entire amount of the judgment.

E.

Finally, MTEK seeks attorneys' fees pursuant to North Carolina General Statute § 75-16.1, anticipating that the Court would find that Clayton admitted to conduct violating North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"). While Clayton's conduct may very well constitute a violation of North Carolina's UDTPA, under North Carolina's choice of law rules, Oregon's unfair trade practices law applies instead. See M-Tek Kiosk, Inc. v. Clayton, No. 1:15CV886, 2016 WL 2997505, at *16 (M.D.N.C. May 23, 2016) (explaining why Oregon law applies). Oregon courts have interpreted that state's Unlawful Trade Practices Act ("UTPA"), Oregon Statute §§ 646.605-656, as applying only

12

to consumers of a defendant's goods or services.  See Benson Tower Condo. Owners Ass'n v. Victaulic Co., 22 F. Supp. 3d 1126, 1135-37 (D. Or. 2014) (explaining Oregon courts' determination that Oregon's UTPA only applies to consumers).  Here, there are no allegations that MTEK was a consumer of Mirrus's, Mirrenium's, or Clayton's goods or services.  Therefore, MTEK could not recover under Oregon's UTPA and, thus, cannot recover attorney's fees pursuant to the UTPA.  Because MTEK moved for attorneys' fees only pursuant to North Carolina's UDTPA which does not apply, its request for attorneys' fees is denied without prejudice to moving for attorneys' fees on another basis, provided one should exist.

III.

For the reasons stated herein, IT IS HEREBY ORDERED that M-Tek Kiosk, Inc.'s Motion for Default Judgment against Defendant Ryan Clayton [Doc. #44] is GRANTED IN PART AND DENIED IN PART.  It is granted as to compensatory and punitive damages in the amount of $1,130,663.76, pre-judgment interest, and post-judgment interest.  It is denied without prejudice as to attorneys' fees.  IT IS FURTHER ORDERED that default judgment be entered against Ryan Clayton in the amount of $1,130,663.76; plus pre-judgment interest on $376,887.92 at a rate of eight percent per annum; plus post-judgment interest on $1,130,663.76 and the

13

Case 1:15-cv-00886-NCT-JEP   Document 46   Filed 03/22/17   Page 13 of 14

pre-judgment interest at a rate of 1.03 percent.

This the 22nd day of March, 2017.

/s/ N. Carlton Tilley, Jr.
Senior United States District Judge